# United States District Court
## Middle District of Florida
### Orlando Division

**UNITED STATES OF AMERICA**

**-vs-**                                    **Case No. 6:02-cr-171-Orl-28KRS**

**JESSE ISSA MAALI**
**M. SALEEM KHANANI**
**KHAN ASLAM**
**SAEEDULLAH AWAN**
**MAHMOOD JAMAL**
**BIG BARGAIN WORLD, INC.**
**SS MART, INC.**
**JEANS UNLIMITED, INC.**
**DENIM UNLIMITED, INC.**
**BARAKAT CORPORATION**
**BARAKAT INTERNATIONAL, INC.**
**DAVID PORTLOCK**
_____

## SENTENCING ORDER AND MEMORANDUM

In a seventy-one count Third Superceding Indictment ("indictment"), the Government charged M. Saleem Khanani ("Mr. Khanani") with fifty-three counts of knowingly encouraging or inducing aliens to reside in the United States (Counts 1-53), one count of conspiring to conceal, harbor, or shield from detection, or to encourage or induce aliens to illegally come to, enter, or reside in the United States (Count 54), one count of money laundering (Count 55), one count each of wire and mail fraud (Counts 56-57), one count of conspiring to attempt to evade federal taxes (Count 58), and thirteen counts of attempting to evade federal taxes (Counts 59-71). The charges against Mr. Khanani stemmed from a scheme in which he and others formed shell companies in order to hire and pay undocumented workers and avoid state and federal employment and income tax obligations.

On December 14, 2004, a jury found Mr. Khanani not guilty of eleven counts of encouraging or inducing aliens to reside in the United States (Counts 2, 3, 7, 10, 11, 15, 23, 33, 38, 44, and 52).  In addition, I subsequently granted a motion for judgment of acquittal filed by Mr. Khanani as to the count of money laundering (Count 55).  United States v. Maali, 358 F. Supp. 2d 1154 (M.D. Fla. Feb. 28, 2005).  As to all other counts charged in the Government's indictment, Mr. Khanani was found guilty and now stands before me for sentencing.[1]

## I. OBLIGATIONS OF SENTENCING JUDGES AFTER BOOKER

In United States v. Booker, 543 U.S. ___, 125 S. Ct. 738 (2005), the Supreme Court "held that 'the Sixth Amendment right to trial by jury is violated where under a mandatory guidelines system a sentence is increased because of an enhancement based on facts found by the judge that were neither admitted by the defendant nor found by the jury.'" United States v. Magluta, ___ F.3d ___, No. 03-10694, 2005 U.S. App. LEXIS 15322, at *41 (11th Cir. July 27, 2005) (quoting United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir.) (emphasis omitted), cert. denied, 125 S. Ct. 2935 (2005)).  Additionally, Booker "established that it is error for [a] district court to sentence a defendant under a mandatory Guidelines scheme, even in the absence of a Sixth Amendment enhancement violation." Id.

--------

[1] Specifically, Mr. Khanani stands before me for sentencing on forty-two counts of encouraging or inducing aliens to reside in the United States (Counts 1, 4-6, 8-9, 12-14, 16-22, 24-32, 34-37, 39-43, 45-51, and 53), one count of conspiring to conceal, harbor, or shield from detection, or to encourage or induce aliens to illegally come to, enter, or reside in the United States (Count 54), one count each of wire and mail fraud (Counts 56-57), one count of conspiring to attempt to evade federal taxes (Count 58), and thirteen counts of attempting to evade federal employment or federal income taxes (Counts 59-71).

(internal quotations and bracketing omitted).  As a consequence, the Supreme Court in

Booker excised the two provisions from the Sentencing Reform Act of 1984 ("Sentencing

Act"), 18 U.S.C. § 3551 et seq., which had the effect of making the United States Sentencing

Guidelines ("guidelines") mandatory.  See id. (citing Booker, 125 S. Ct. at 764).  Thus, at

present, the guidelines remain in effect but only in advisory form.  Id.

    In the wake of Booker, sentencing judges now bear four basic obligations in

sentencing.  First, judges must "calculate *correctly* the sentencing range prescribed by the

Guidelines."  United States v. Crawford, 407 F.3d 1174, 1178 (11th Cir. 2005).  Second,

judges must take this sentencing range into consideration before imposing a sentence.  See

Crawford, 407 F.3d at 1178-79; United States v. Shelton, 400 F.3d 1325, 1332 n.9 (11th Cir.

2005); Booker, 125 S. Ct. at 764-65;  see also Booker, 125 S. Ct. at 790 (Scalia, J.,

dissenting).  Third, after consulting and considering the Guidelines, judges must impose a

"reasonable" sentence.  See Crawford, 407 F.3d at 1179 ("After it has made [the Guidelines]

calculation, the district court may impose a more severe or more lenient sentence as long

as the sentence is reasonable . . . .") (citing Booker, 125 S. Ct. at 767).  The extent to which

a sentence is reasonable depends not only on the advisory sentencing range, but also on

the numerous other factors listed under 18 U.S.C. § 3553(a), including "the need for the

sentence imposed . . . to provide just punishment for the offense," § 3553(a)(2)(A), "to afford

adequate deterrence to criminal conduct," § 3553(a)(2)(B), and "to protect the public from

further crimes of the defendant," § 3553(a)(2)(C).  See id.; Booker, 125 S. Ct. at 766-67

(explaining that the § 3553(a) "factors in turn will guide appellate courts, as they have in the

past, in determining whether a sentence is unreasonable").  Fourth, it must not be forgotten,

in the midst of so much emphasis on the continued viability of the Guidelines, that judges are required by the Sixth Amendment to refrain from treating the Guidelines as mandatory whether out of "ignorance, negligence, . . . defiance" or for any other reason.  United States v. Rodriguez, 406 F.3d 1261, 1273 (11th Cir. 2005); see also Booker, 125 S. Ct. at 795 (Scalia, J., dissenting) (suggesting that "appellate review for 'unreasonableness' [might] preserve de facto mandatory Guidelines by discouraging district courts from sentencing outside Guidelines ranges");  United States v. Jaber, 362 F. Supp. 2d 365, 367 (D. Mass. 2005) ("'[A]dvisory' does not mean a regime without rules, or a return to the standardless sentencing which preceded the [Sentencing Reform Act].  Nor does it mean slavish application of the Guidelines under the guise of fair 'consideration,' an approach which is now unconstitutional.") (footnote omitted).

## II.  THE GUIDELINES SENTENCING CALCULUS

The determination of a sentencing range under the Guidelines begins with the calculation of a "combined offense level" score and "criminal history points."  These scores are then located on a sentencing grid which indicates the defendant's advisory sentencing range.

### A.  Combined Offense Level

The first step to calculating a combined offense level is ascertaining which offense guidelines are applicable to the offenses of conviction.   United States Sentencing Commission, Guidelines Manual (hereinafter "USSG"), § 1B1.2(a) (Nov. 2000).[2]  Pursuant

---

[2]  See infra note 4.

to the instructions provided within the applicable offense guidelines, an initial offense score for each offense of conviction is calculated by adding points assigned to the offense of conviction itself ("base offense level"), characteristics of the specific offense ("specific offense characteristics"), and any applicable adjustments "related to victim, role, and obstruction of justice." USSG § 1B1.1(b)-(c).

Any counts "involving substantially the same harm" are then grouped. USSG § 3D.2(d). This is done whenever: (a) "counts involve the same victim and the same act or transaction"; (b) "counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan"; (c) "one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts"; or (d) "the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior." USSG § 3D1.2. In the event that counts are grouped, the offense level for the group is generally equal to the highest offense level of the counts in the group. See USSG § 3D1.3.

After any necessary grouping is completed, a "combined offense level" is calculated under a tortuous formula that begins by assigning units to each offense group. Units are assigned as follows: (a) the group with the highest offense level is assigned one unit; (b) each group with an offense level that is equal to or is within one to four levels of the group with the highest offense level is assigned one unit; (c) each group with an offense level that

is within five to eight levels of the group with the highest offense level is assigned one-half-unit; and (c) each group with an offense level that is nine or more levels less than the group with the highest offense level is not assigned any units. USSG § 3D1.4. The units are then translated into offense levels under the following set of conversions:

| | |
|---|---|
| 1 unit | 0 levels |
| 1 ½ units | 1 level |
| 2 units | 2 levels |
| 2 ½ units to 3 units | 3 levels |
| 3 ½ to 5 units | 4 levels |
| More than 5 units | 5 levels |

Id. After the conversions are made, the final step in the calculation of a combined offense level is adding the extra offense levels to the offense group with the highest offense level. Id.

### B. Criminal History Points

Criminal history points are calculated by adding point values assigned to various elements of the defendant's criminal past. See USSG § 4A1.1.

### C. Sentencing Grid

The centerpiece of the Guidelines sentencing formula is the sentencing grid. The vertical axis of the grid contains all possible combined offense levels ranging from one to forty-three, whereas the grid's horizontal axis is divided into six criminal history categories which correspond to the range of all possible criminal history scores. Below the horizontal axis and to the right of the vertical axis are 258 possible sentencing ranges. The appropriate

sentencing range on the grid is located at the point where, moving downward vertically from the horizontal axis and rightward horizontally from the vertical axis, the criminal history score and combined offense level intersect.

## III.  STANDARD OF PROOF FOR APPLYING ENHANCEMENTS

Prior to Booker, it was "the settled law of this circuit that at sentencing, a federal defendant's due process rights are . . . satisfied by the preponderance of the evidence standard." United States v. Patti, 337 F.3d 1317, 1323 n.9 (11th Cir. 2004) (quoting United States v. Jackson, 57 F.3d 1012, 1019 (11th Cir. 1995)).  While the Government argues that the preponderance standard still applies post-Booker, Mr. Khanani maintains that enhancing facts must now be proven beyond a reasonable doubt.

Mr. Khanani's argument seems to rest largely on the fear that the shift from a mandatory to an advisory Guidelines regime will alone have little if any practical bearing on the sentencing habits of judges.  See Tr. of June 13, 2005, Oral Argument, Doc. 1105 (hereinafter "Sentencing Oral Argument"), at 58-59 ("It seems to me that if the theme of Booker is that a defendant is entitled [to] those additional protections, if the result of Booker is that the lower standard would continue to apply, that it would be applied as an enhancement, albeit advisory, then the Booker decision really doesn't have any teeth to it in terms of protecting a defendant's rights.").  Given the uncertainty that surrounds Booker, this concern is not without some foundation.  As Justice Scalia expressed in his dissent to the remedial majority's opinion in Booker, one possible consequence of having an advisory Guidelines regime in which the sentencing decisions of judges are reviewed under a reasonableness standard is that judges will simply refrain from "sentencing outside

Guidelines ranges," thereby creating a "*de facto* mandatory Guidelines" regime. 125 S. Ct. at 795. The prospect of this consequence, at least in the minds of defendants, must surely be compounded by the Government's position that any sentence outside the Guidelines is presumptively, if not *per se*, unreasonable. See Gov't's Resp. to Def.'s Sentencing Mem., Doc. 1030, at 8; United States v. Williams, 372 F.Supp. 2d 1335, 1337 (M.D. Fla. 2005) (Presnell, J.) (noting the government's position "that any sentence, other than a guideline sentence, would be unreasonable (and thus illegal)").

Compelling as Mr. Khanani's fear may be, however, there is "[n]othing in Booker [which] suggests that sentencing judges are required to find sentence-enhancing facts beyond a reasonable doubt under the advisory Guidelines regime." United States v. Pirani, 406 F.3d 543, 552 n.4 (8th Cir. 2005). To the contrary, Booker made clear that "[i]f the Guidelines . . . could [have been] read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not [have] implicate[d] the Sixth Amendment." 125 S. Ct. at 750. Thus, now that the Guidelines not only can, but must be "read as merely advisory," I can only assume, as most other courts have, that there is no cause, constitutional or otherwise, for further disturbing the protocol for determining sentencing ranges under the Guidelines. See Pirani, 406 F.3d at 552 n.4; Cirilo-Munoz v. United States, 404 F.3d 527, 532-33 (1st Cir. 2005) (holding that the lower court's finding of an enhancement by a preponderance of the evidence was not erroneous because "Booker . . . preserved the use of judge-made findings by directing that the guidelines hereafter be treated as advisory rather than mandatory [G]uidelines."); United States v. Yagar, 404 F.3d 967, 972 (6th Cir. 2005) ("[A]

finding under the Guidelines must be based on reliable information and a preponderance of the evidence."); United States v. Guzman, 404 F.3d 139, 143 (2d Cir. 2005); United States v. Mares, 402 F.3d 511, 519 (5th Cir. 2005) ("The sentencing judge is entitled to find by a preponderance of the evidence all the facts relevant to the determination of a Guideline sentencing range and all facts relevant to the determination of a non-Guidelines sentence."); McReynolds v. United States, 397 F.3d 479, 481 (7th Cir. 2005) ("The remedial portion of Booker held that decisions about sentencing factors will continue to be made by judges, on the preponderance of the evidence, an approach that comports with the [S]ixth [A]mendment so long as the guideline system has some flexibility in application."). But see United States v. Pimental, 367 F. Supp. 2d 143, 153-54 (D.Mass. 2005) (finding that the Fifth Amendment requires application of the beyond a reasonable doubt standard to enhancements); see also United States v. Huerta-Rodriguez, 355 F. Supp. 2d 1019, 1027 (D. Neb. 2005).

This determination comes, however, with two important caveats. First, as the remainder of this Order will hopefully make clear, I have no intention of placing arbitrary barriers in the way of my constitutional obligation to treat Guidelines sentences as advisory. Second, in my estimation, the variance between the preponderance of the evidence standard and the reasonable doubt standard must necessarily bear, to some extent, on the persuasive force of an advisory Guidelines range. Cf. United States v. Gray, 362 F. Supp. 2d 714, 723-24 (S.D. W. Va. 2005) (determining that a Guidelines sentencing range should be considered under a reasonable doubt standard after the range is calculated under the preponderance of the evidence standard); United States v. Coleman, 370 F. Supp. 2d 661, 668 (S.D. Ohio 2005) ("To the extent that an enhancement detracts from a defendant's

liberty, its imposition should be considered with extreme scrutiny.").  To view the matter otherwise would be at odds with the long established principle that determinations directly bearing on life and liberty must be met with more exacting scrutiny than other judicial determinations.  See, e.g., In re Winship, 397 U.S. 358, 372 (1970).[3]

## IV.  THE GUIDELINES CALCULATION

The baseline for calculating an advisory sentencing range under the Guidelines is the United States Probation Office's ("the Probation Office") presentence investigation report ("PSR").  The PSR contains a preliminary calculation of the Guidelines that functions to apprise the parties of possible sentencing issues and to aid the Court in determining the appropriate advisory sentencing range.  In this case, the Probation Office, using the 2000 edition of the Sentencing Guidelines,[4] recommended that Mr. Khanani be confined to the Federal Bureau of Prisons for a period of 121 to 151 months followed by two years of

---

[3] As Booker reminded us, the effect of jury verdicts and enhancements of sentences is the same from the standpoint of the Sixth Amendment: liberty is lost.

[4] There is no dispute in this case concerning which edition of the Sentencing Guidelines should be applied to calculate Mr. Khanani's advisory sentencing range. Ordinarily, courts should use the edition of the Guidelines "in effect on the date the defendant is sentenced . . . ." 18 U.S.C. § 3553(a)(4)(A)(ii).  "The Constitution's Ex Post Facto Clause, however, prevents the Government from imposing additional penalties for crimes that have already been committed. United States v. Simmons, 368 F.3d 1335, 1338 (11th Cir. 2004) (citing U.S. Const. art. I, § 9, cl. 3).  "Consequently, although courts must presumptively apply [the edition of the Guidelines in effect] at the time of sentencing, they may not do so," in a case such as this one, in which that edition "would lead to imposition of a harsher penalty than that to which the defendant was subject at the time of [his] offense[s].  In such cases, the [edition of the Guidelines] applicable at the time of the offense[s] must be applied." Id.  Here, that edition is the November 2000 edition of the Guidelines.

supervised release and further recommended that he pay restitution to the State of Florida in the amount of $259,978 and a fine of $17,500.  PSR, at 16, 18.

Mr. Khanani has filed numerous objections to the PSR.  For the reasons set forth below, those objections must be sustained in part and overruled in part.

## A. GROUPING

Mr. Khanani's first objection to the PSR concerns the grouping of his offenses.  The Probation Office grouped Mr. Khanani's offenses into three groups: (1) all of Mr. Khanani's immigration offenses; (2) his mail and wire fraud offenses; and (3) his tax violations.  Mr. Khanani raises no objection to the grouping of his immigration offenses but contends that his fraud and tax violations should be grouped together under § 3D1.2(c) or § 3D1.2(d).

### 1. § 3D1.2(c)

Section 3D1.2(c) provides that counts involve "substantially the same harm" and thus should be grouped together "[w]hen one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guidelines applicable to another of the counts."  USSG § 3D1.2(c).  Mr. Khanani argues that § 3D1.2(c) requires grouping of his tax and fraud offenses because the loss attributable to his tax offenses is treated as a specific offense characteristic of his fraud offenses.  Mr. Khanani's argument, though correct in its characterization of the manner in which the Guidelines treat his tax offenses, relies on an erroneous construction of § 3D1.2(c).

Both the tax evasion and fraud guidelines require calculations of loss.  While "the base offense level for taxation offenses depends on . . . tax loss, . . . [f]inancial loss is a specific offense characteristic of fraud . . . ."  See United States v. Cabrera, 288 F.3d 163,

172 n.8 (5th Cir. 2002) (citing USSG § 2T1.1(a) and § 2F1.1(b)(1)).  Although the two loss calculations are technically separate, the loss amounts attributable to each type of offense are bound to overlap in cases in which the defendant committed fraud in furtherance of avoiding taxes.

In this case, while the object of Mr. Khanani's fraud may have extended beyond tax evasion, the only resultant monetary loss, according to the Probation Office, came in the form of the taxes he avoided.  <u>See</u> PSR, at 7-10 (calculating the respective losses attributable to Mr. Khanani's fraud and tax offenses to each be in the amount of $2,759,560).[5]  There is no question, therefore, that the Guidelines, in effect, treat the tax loss arising from his tax evasion as a specific offense characteristic of his fraud offenses.  <u>See</u> <u>id.</u> at 9-10 (counting the tax loss both in the determination of the base offense level for tax evasion and as a specific offense characteristic of fraud); <u>see also</u> USSG §§ 2T4.1(P)-(Q), 2F1.1(a)-(b)(1).

This fact alone, however, fails to establish that grouping is required under the plain terms of § 3D1.2(c).  Placed in the context of § 3D1.2(c), Mr. Khanani's argument is essentially this: Tax evasion "embodies the conduct [of tax loss] [which] is treated as a specific characteristic in . . . the guidelines applicable to [fraud]."  The problem, of course, is that tax loss is not "conduct."  <u>See</u> Black's Law Dictionary 315 (8th ed. 2004) (defining conduct as "[p]ersonal behavior, whether by action or inaction").  Moreover, the "conduct" that tax evasion does embody–the willful avoidance of taxes–is not treated as a specific

_____

[5] The exact amount of monetary loss arising from Mr. Khanani's offenses remains to be determined.

-12-

characteristic under the fraud guideline.  Thus, notwithstanding the fact that tax loss is counted in the determination of the offense levels for both Mr. Khanani's tax and fraud offenses, grouping is not required under § 3D1.2(c).

**2.  § 3D1.2(d)**

Under § 3D1.2(d), the grouping of "[c]ounts involving offenses to which different offense guidelines apply" depends on two factors.  USSG § 3D1.2 cmt. n.6.  First, the offense levels for the counts must be "determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm."  USSG § 3D1.2(d).  Second, the offenses must be "of the same general type."  USSG § 3D1.2 cmt. n.6.

**a.  Determination of Offense Levels**

There is no question in this case that the offense levels for fraud and tax evasion are "determined largely on the basis of the total amount of harm or loss" that arose from those offenses.  Twenty-one (21) of the twenty-nine (29) levels assigned to the tax offense group and thirteen (13) of the twenty-seven (27) levels assigned to the fraud group are the product of loss calculations.  See PSR, at 9-10.  In each group, moreover, the score assigned to financial loss is easily the greatest single factor in the offense level calculation.[6]  Id.

**b.  Same General Type Requirement**

The commentary to § 3D1.2(d) does not define "same general type" but instructs that the phrase "is to be construed broadly."  USSG § 3D1.2 cmt. n.6.  In addition, the

---

[6]  In the PSR, the next greatest offense score for the tax and fraud groups are, respectively, four (4) and six (6).  PSR, at 9-10.

commentary explains that "[t]he same general type of offense . . . would include, for example, larceny, embezzlement, forgery, and fraud."[7]  Id.  Although the commentary fails to specify what category the four exemplary offenses fall under or otherwise explain why the offenses may be deemed as generally the same for grouping purposes, the illustration nonetheless offers some insight into the meaning of "same general type."

In this regard, three aspects of the commentary's illustration are noteworthy.  First, "larceny, embezzlement, forgery, and fraud" share no one formal element in common.  While each offense typically involves the unlawful taking of property, only larceny and embezzlement are, by definition, property crimes.  See Black's Law Dictionary 561, 677, 685, 896 (8th ed. 2004) (defining only larceny and embezzlement as necessarily involving the unlawful taking of property); see also United States v. Williams, 154 F.3d 655, 657 n.1 (6th Cir. 1998) (referring to the four offenses as "property crimes, broadly defined").  Similarly, whereas embezzlement, forgery, and fraud are all types of fraud, the same is not true of larceny.  See Black's Law Dictionary 897 (8th ed. 2004) (defining "larceny" as "[t]he unlawful taking and carrying away of someone else's personal property with the intent to deprive the possessor of it permanently").  Second, the four offenses are not classified as the same type of offenses "elsewhere in the Guidelines."  Williams, 154 F.3d at 657 n.1.  For instance, while embezzlement is defined under Chapter 2, Part B of the Guidelines as an offense involving

_____

[7]  In the latest edition of the Guidelines, United States Sentencing Commission, Guidelines Manual, (Nov. 2004), this illustration is omitted.  See USSG § 3D1.2 cmt. n.6 (2004). Presumably, this is because a single guideline, USSG § 2B1.1, now covers "larceny, embezzlement, forgery, and fraud," thus rendering inapplicable the instruction in the commentary to § 3D1.2 regarding "[c]ounts involving offenses to which different offense guidelines apply."

property, forgery is characterized as an offense involving fraud or deceit under Chapter 2, Part F.[8]  See Williams, 154 F.3d at 657 n.1 ("Presumably, the drafters added this illustration of 'same general type' in order to reinforce the notion that property crimes, broadly defined, are to be grouped, notwithstanding the fact that certain of the offenses listed do not fall within the definition of property crimes elsewhere in the Guidelines.").  Lastly, the loss-to-offense level ratios for the offenses are not the same.  Compare USSG § 2B1.1(b)(1) (loss table for embezzlement and larceny) and USSG § 2F1.1(b)(1) (loss table for fraud and forgery).  In short, these three aspects of the commentary's illustration at least signal what is *not* required for offenses to be of the "same general type" for purposes of grouping and, thereby, underscore the instruction that "the 'same general type' of offense" is to be construed *broadly.*"  USSG § 3D1.2 cmt. n.6 (emphasis added).

In arguing that Mr. Khanani's tax and fraud offenses should not be grouped, the Government does not endeavor to construe the terms of § 3D1.2(d) or its accompanying commentary.  Instead, the Government merely contends that tax evasion and fraud: (1) involve "different victims"; (2) are scored under different loss tables; and (3) otherwise should not be grouped because grouping would result in no punishment for Mr. Khanani's tax evasion.[9]  See Letter from Cynthia A. Hawkins, Assistant United States Attorney, to David

---

[8]  Under the most recent version of the Guidelines, both offenses are now defined even more broadly as "basic economic offenses."  USSG Ch. 2, pt. B (Nov. 2004).

[9]  The Government's basic position that fraud and tax evasion are not groupable offenses under § 3D1.2(d) is consistent with the prevailing view among circuit courts.  See United States v. Martin, 363 F.3d 25, 44 (1st Cir. 2004); United States v. Shevi, 345 F.3d 675, 680-81 (8th Cir. 2003); Weinberger v. United States, 268 F.3d 346, 353-355 (6th Cir. 2001); United States v. Lindsay, 184 F.3d 1138, 1142-43 (10th Cir. 1999). But see United

J. Salce, U.S. Probation Office, of April 29, 2005, 1-2 (hereinafter "AUSA Letter").   In my view, none of these arguments possesses sufficient merit to foreclose the grouping of tax evasion and fraud under § 3D1.2(d).

The Government's first two arguments, while presumably seeking to establish that tax evasion and fraud are not sufficiently "the same" for the purposes of § 3D1.2(d), pay little heed to the guidance set forth in that guideline and its commentary.[10]   First, in regard to the Government's emphasis on "different victims," the Second Circuit has persuasively observed that "[i]t would be wrong . . . to project a same-victim requirement into § 3D1.2(d) [when] . . . no such requirement is mentioned in [the guideline]."   United States v. Napoli, 179 F.3d 1, 9 (2d Cir. 1999).   The "omission" of any reference to victims in § 3D1.2(d) is particularly significant "in light of the fact that [§ 3D1.2(a) and (b)] both explicitly require harm to the 'same victim.'"   Id.   Furthermore, "the [b]ackground to § 3D1.2's [c]ommentary states that counts 'involving different victims (or societal harms in the case of 'victimless' crimes) are grouped together only as provided in [§ 3D1.2(d)].'"   Id. (emphasis removed).   "Finally, [the commentary] to [§ 3D1.2(d)] gives examples of counts that should be grouped under that

_____

States v. Gordon, 291 F.3d 181, 192 (2d Cir. 2002) (explaining that the offenses should be grouped under § 3D1.2).

[10]   The Government has also argued, more generally, that the harms of tax evasion and fraud are not the same.   See, e.g., Tr. of Sentencing Oral Arg., at 23 ll. 19-20 ("[T]he harms attributable to each crime are dissimilar.") (relying on United States v. Peterson, 312 F.3d 1300 (10th Cir. 2002)).   This argument is decidedly circular.   In essence, the Government contends that tax evasion and fraud should not be grouped under a guideline which instructs to group counts involving "substantially the same harm," USSG § 3D1.2, because the counts do not involve the same harm.

subsection, including cases in which a 'defendant is convicted of two counts of theft of social security checks and three counts of theft from the mail, *each from a different victim*.'" Id.

The Government's emphasis on the differences in the fraud and tax evasion loss tables is also misplaced.  As noted earlier, the losses for "larceny and embezzlement" and the losses for "forgery, and fraud" are calculated under distinct loss tables, yet these crimes are specifically set forth in the guideline's commentary as groupable offenses.  Compare USSG §§ 2B1.1(b)(1) (loss table for theft) with 2F1.1(b)(1) (loss table for fraud).  See also USSG § 3D1.3(b) (providing that "[w]hen . . . offenses of the same general type to which different guidelines apply (*e.g., theft and fraud*) [are grouped pursuant to § 3D1.2(d)], the offense guideline that produces the highest offense level [should be applied]") (emphasis added).[11]

Finally, the Government's contention that grouping would result in no penalty being imposed for Mr. Khanani's tax evasion is an argument not so much against the grouping of tax evasion and fraud as it is against the practice of grouping itself.  That is to say, grouping, to one degree or another, always involves the reduction or removal of a penalty for an

---

[11] Although the variation in the fraud and theft tables no longer remains in the latest edition of the Guidelines, the fact remains that § 3D1.2(d) originally contemplated the grouping of offenses with different loss tables.  One might argue, of course, that such inference should no longer obtain now that the fraud and theft tables are symmetrical.  Yet, had the Sentencing Commission intended to defeat the inference that offenses with different loss tables can or should be grouped, it must be assumed that they would have done so expressly, rather than merely allowing for one inference to be countered with another.  It bears noting, moreover, that, even if the Sentencing Commission somehow intended to effect a substantive change by disallowing the grouping of offenses with different loss tables, the Ex Post Facto Clause would nonetheless require the application of the approach prescribed in the year 2000.  United States v. Simmons, 368 F.3d 1335, 1338 (11th Cir. 2004).

offense.  See USSG § 3D1.3 cmt. n.4 ("Sometimes the rule specified in this section may not result in incremental punishment for additional criminal acts because of the grouping rules."). My role, however, is not to question the wisdom of this or any other practice prescribed by the Guidelines but to calculate an advisory sentencing range in accordance with the Guidelines as they are written.[12]

Under this approach, I conclude that a fair reading of § 3D1.2(d) demands that Mr. Khanani's fraud and tax offenses be grouped.  See United States v. Gordon, 291 F.3d 181, 189-93 (2d Cir. 2002) (explaining that tax evasion and fraud should be grouped under § 3D1.2(d) and holding that § 3D1.3 requires that quantifiable offenses be grouped under § 3D1.2(d) rather than § 3D1.2(c)).  As one court has observed, tax evasion is, at its essence, an "attempt to defraud the government by evading [taxes]."  United States v. Robinson, 974 F.2d 575, 578 (5th Cir. 1992) (internal quotations and citation omitted); see also Black's Law Dictionary 1501 (8th ed. 2004) (defining tax evasion as "[t]he willful attempt to defeat or circumvent the tax law in order to illegally reduce one's tax liability"); 26 U.S.C. § 7201 (tax evasion statute).[13]  Taking this basic fact together with the instruction in the commentary to

---

[12]  An additional reason sometimes put forth for not grouping tax evasion and fraud counts is that the offenses involve "different conduct."  See, e.g., United States v. Martin, 363 F.3d 25, 44 (1st Cir. 2004).  With respect, I do not find this distinction persuasive.  Any two offenses necessarily involve "different conduct"; otherwise, they would not be two offenses but one.

[13]  Indeed, the Eleventh Circuit has, on at least one occasion, used the terms "tax evasion" and "tax fraud" synonymously.  Blohm v. Commissioner, 994 F.2d 1542, 1554 (11th Cir. 1993) (referring to a conviction for tax evasion under 26 U.S.C. § 7201 as "a criminal tax fraud conviction").

§ 3D1.2(d) to construe "same general type" broadly, there is little doubt that tax evasion and fraud are offenses of "the same general type."[14]

### B.  TAX AND FRAUD OFFENSES (GROUP II)

Section 3D1.3(b) provides that when counts "grouped together pursuant to § 3D1.2(d) . . . involve offenses of the same general type to which different guidelines apply, . . . the offense guideline that produces the highest offense level" must be applied.  Thus, in order to arrive at an offense level score for Mr. Khanani's tax and fraud offenses, the offense level scores for his tax and fraud offenses must be independently calculated in order to determine which of the two offense level scores is greater.

### 1.  Tax Offense Level

The Probation Office arrived at an offense level score of twenty-nine (29) for Mr. Khanani's tax offenses by adding together a base offense level of twenty-one (21) on the basis that Mr. Khanani's tax offenses resulted in a "tax loss" of approximately $2.7 million, USSG §§ 2T1.1(a)(1), 2T4.1(P); a specific offense characteristic score of two (2) on the basis that the tax offenses "involved sophisticated concealment," USSG § 2T1.1(b)(2); an adjustment for role in the offense of four (4) on the basis that Mr. Khanani "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," USSG § 3B1.1(a); and an adjustment for role in the offense of two (2) on the

---

[14]   In the alternative, the crimes of fraud and tax evasion may also be broadly classified as property crimes, given that both offenses are generally committed in an aim to effect deprivations of property.  As the illustration of "larceny, embezzlement, forgery, and fraud" make clear, the fact that neither fraud nor tax evasion requires an actual deprivation of property is not necessarily determinative.

basis that Mr. Khanani "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the [Government's] investigation," USSG § 3C1.1.  Mr. Khanani objects to all of the findings that the Probation Office made in order to calculate the offense level for his tax offenses.

### a.  Base Offense Level: Tax Loss

The tax guideline, USSG § 2T1.1, "provides sentencing standards for 'Tax Evasion; Willful Failure to File Return, Supply Information, or Pay Tax; Fraudulent or False Returns, Statements, or Other Documents.'" United States v. Gordon, 291 F.3d 181, 187 (2d Cir. 2002) (quoting § 2T1.1).  "Pursuant to USSG § 2T1.1(a), the base offense level for tax evasion, or the payment thereof, is the greater of the 'level from § 2T4.1 (Tax Table) corresponding to the tax loss' or 6, if there is no tax loss."  United States v. Hunerlach, 197 F.3d 1059, 1069 (11th Cir. 1999) (quoting the tax guideline).

At trial, the Government prepared two calculations of "tax loss."  The first calculation, which made no account for any deductions that Mr. Khanani and his coconspirators could have claimed had they complied with the tax laws, estimated the "tax loss" from Mr. Khanani's tax offenses to be approximately $2.7 million.  The second calculation, which accounted for the deduction of "off the books wages" that Mr. Khanani and his coconspirators paid to undocumented employees, estimated the loss to be in the range of $1.2 million.  Mr. Khanani did not submit a calculation of estimated "tax loss" either at trial or at sentencing.

In determining the base offense level for Mr. Khanani's tax offenses, the Probation Office adopted the larger of the Government's two estimates.  Using this loss estimate, the

Probation Office determined, pursuant to the Tax Table in § 2T4.1(a), that the base offense level for Mr. Khanani's offenses was twenty-one (21).[15]

Mr. Khanani objects to the Probation Office's reliance on the larger "tax loss" estimate and contends that the "tax loss" resulting from his offenses was, at the very most, $1.2 million. If granted, Mr. Khanani's objection would warrant at least a two-level reduction in the base offense level for his tax offenses.[16]  In response, the Government maintains that Mr. Khanani should not get the benefit of deductions after the fact of his tax evasion.

Analysis begins by examining the plain language of the tax guideline.  Under the tax guideline, "tax loss" is calculated pursuant to § 2T1.1(c)(1)(A) which provides that:

> If the [tax] offense involved filing a tax return in which gross income was underreported, the tax loss shall be treated as equal to 28% of the unreported gross income (34% if the taxpayer is a corporation) plus 100% of any false credits claimed against tax, *unless a more accurate determination of the tax loss can be made*.

USSG § 2T1.1(c)(1)(A) (emphasis added).  The tax guideline provides no explanation of what is meant by "a more accurate determination" or what data may be factored into such a determination.  At least one court, however, has determined that the plain import of the clause is that a "sentencing court need not base its tax loss calculation on gross unreported income if it can make 'a more accurate determination' of the intended loss and that determination of

_____

[15]  The tax table assigns a base offense level of twenty-one (21) for any amount more than $2.5 million but less than or equal to $5 million.  USSG § 2T4.1(P)-(Q).

[16]  Under the tax table, a "tax loss" that exceeds $950,000 but is less than or equal to $1.5 million yields a base offense level of nineteen (19).  USSG § 2T4.1(N)-(O).

the tax loss involves giving the defendant the benefit of legitimate but unclaimed deductions."[17]

United States v. Martinez-Rios, 143 F.3d 662, 671 (2d Cir. 1998); accord United States v. Gordon, 291 F.3d 181, 187 (2d Cir. 2002).  I agree with this conclusion and add that the very definition of "loss" contemplates the consideration of unclaimed deductions.  As Mr. Khanani contends, neither the federal government nor the state of Florida can claim to have *lost* revenue that they never would have collected had Mr. Khanani and his coconspirators not evaded their taxes.  See Webster's Third New International Dictionary 1338 (1981) (defining "loss" as "the harm or privation resulting from losing or being separated from something").[18]

See United States v. Bishop, 291 F.3d 1100, 1116 (9th Cir. 2002) (refusing to reduce tax loss by the amount of legitimate but unclaimed deductions where defendant "did not offer such information at the time of sentencing"); United States v. Sullivan, 255 F.3d 1256, 1264 (10th Cir. 2001) (affirming the district court's decision to use a flat percentage rate, without deductions, to calculate tax loss where the defendant had no evidence to show that he could

-------------------

[17]  The Government contends that this analysis is "flawed" because "§ 2T1.1 states that the amount of loss is that which is the object of the offense."  AUSA Letter, at 6.  While the Government is correct insofar as § 2T1.1 provides that "tax loss" is "the loss that would have resulted had the [tax] offense been successfully completed," USSG § 2T1.1(c)(1), this fact has no bearing on the issue at hand.  The issue presented by Mr. Khanani's objection is not whether "tax loss" includes all the loss that would have resulted had his tax offenses been successfully completed (which they were), but whether "tax loss" contemplates legitimate but unclaimed deductions.

[18]  This determination is bolstered by the fact that, in 1993, the Sentencing Commission not only amended the tax guideline to make provision for "a more accurate determination" of "tax loss" but deleted language in the commentary which stated that one of the aims of calculating "tax loss" purely on the basis of a default marginal tax rate was to "make irrelevant the issue of whether the taxpayer was entitled to offsetting adjustments that he failed to claim."  Martinez-Rios, 143 F.3d at 671 (quoting USSG § 2T1.1 cmt. n.4).

have claimed legitimate deductions); <u>see also</u> USSG § 2T1.1, cmt. n.1 (providing for application of a presumptive tax rate "unless the *government or defense* provides sufficient information for a more accurate assessment of the tax loss") (emphasis added).

In this case, to determine a "tax loss" that takes into account lawful but unclaimed deductions, I need not look any further than the Government's $1.2 million calculation,[19] an amount which properly accounts for the wages that Mr. Khanani and his coconspirators paid to their undocumented workers.[20]  Under the tax table, a tax loss of this amount translates to a base offense level of nineteen (19).

### b. Specific Offense Characteristic: Sophisticated Means

Mr. Khanani's objection to the Probation Office's determination that his scheme to evade taxes did not involve "sophisticated concealment" must be overruled.  The fact that Mr. Khanani used "shell companies" to achieve his scheme to defraud the federal government of more than $1.2 million in tax revenue was alone a sufficient basis for the Probation Office's determination that Mr. Khanani's scheme involved sophisticated concealment.

_____

[19] The Government correctly asserts that Mr. Khanani's tax scheme also deprived the State of Florida of $259,978.  However, for the purpose of determining the base offense level for Mr. Khanani's tax offenses, this additional amount has no significance.  <u>See</u> USSG §2T4.1(N)-(O) (providing that a "tax loss" that exceeds $950,000 but is less than or equal to $1.5 million yields a base offense level of nineteen (19)).

[20] Mr. Khanani has intimated that the tax loss calculation should be further reduced by the amount of refunds that the undocumented workers would have likely received from estimated employment tax withholdings.  No evidence, however, was presented at trial or at sentencing which could enable me to calculate with any precision the amounts of such hypothetical refunds.  The tax guideline makes clear that it is only when "the government or defense provides sufficient information for a more accurate assessment of the tax loss" that such an assessment should be made.  § 2T1.1 cmt. n.1; <u>see also</u> <u>Bishop</u>, 291 F.3d at 1116; <u>Sullivan</u>, 255 F.3d at 1264.

### c. Role in the Offense: Organizer or Leader of Extensive Criminal Activity

Mr. Khanani's objection to the Probation Office's determination that he was an organizer or leader of the tax fraud scheme is also unavailing.  As the Government contends, "the trial evidence indicated that [Mr. Khanani], as an owner, was present at the executive committee meetings [,] received all the documents concerning the financial activities of the companies . . . [and] supervised the person who handled the cash payroll."  AUSA Letter, at 7.

### d. Role in the Offense: Obstruction of Justice

Finally, the Probation Office determined that Mr. Khanani obstructed justice by telling two of his coconspirators "not to tell the truth about . . . the scheme to pay the illegal aliens without paying taxes."[21]  This evidence was unrebutted.  Thus, under the  preponderance of the evidence standard, the Government's evidence of this enhancing factor has been established.

### e. Conclusion: Offense Score for Tax Offenses

Based on the analysis set forth above, the Probation Office's recommended sentencing score of twenty-nine (29) for the tax offenses must be reduced by two (2) points to twenty-seven (27).

### 2. Fraud Offense Level

The Probation Office arrived at an offense level score of twenty-nine (29) for Mr. Khanani's fraud offenses by adding together a base offense level of six (6), USSG § 2F1.1(a);

_____

[21]  This evidence came in the form of testimony that the two coconspirators provided at trial.

a specific offense characteristic score of thirteen (13) on the basis that Mr. Khanani's fraud offense resulted in a "tax loss" of approximately $2.7 million, USSG §§ 2F1.1(b)(1)(N)-(O); a specific offense characteristic score of two (2) on the basis that the fraud offenses involved "more than minimal planning," USSG § 2F1.1(b)(2); a specific offense characteristic score of two (2) on the basis that the fraud offenses "involved sophisticated means," USSG § 2F1.1(b)(6)(C); an adjustment for role in the offense of four (4) on the basis that Mr. Khanani "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," USSG § 3B1.1(a); and an adjustment for role in the offense of two (2) on the basis that Mr. Khanani "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the [Government's] investigation," USSG § 3C1.1.

### a. Effect of § 3D1.3(b)

As earlier noted, § 3D1.3(b) instructs sentencing courts to apply the "the offense guideline that produces the highest offense level" when grouping counts "of the same general type to which different offense guidelines apply."  Given this instruction, and in light of the fact that the tax offenses have already been scored at an offense level of twenty-seven (27), a review of Mr. Khanani's objections to the Probation Office's fraud offense calculation is only necessary to the extent that the fraud offense level may be scored higher than twenty-seven (27).

### b. Specific Offense Characteristic: Loss

Against this background, analysis begins and ends with Mr. Khanani's objection to the Probation Office's determination that his fraud offenses resulted in a loss of approximately

$2.7 million.  The Probation Office's fraud loss calculation is, in all respects, identical to its tax loss calculation and must, like the tax loss calculation, be rejected in favor of the more modest calculation of $1.2 million.

Under the fraud loss table provided in § 2F1.1(b)(1), a loss of $1.2 million translates to a specific offense characteristic score of eleven (11).[22]  The result is a reduction of the score for Mr. Khanani's fraud offenses to twenty-seven (27)–the exact score already assigned to his tax offenses.  The score for the tax and fraud offenses group, therefore, is twenty-seven (27).

## C.  IMMIGRATION OFFENSE LEVEL (GROUP I)

The Probation Office arrived at an offense level of twenty-seven (27) for Mr. Khanani's immigration offenses by adding together a base offense level of twelve (12), USSG § 2L1.1(a)(2); a specific offense characteristic score of nine (9) on the basis that Mr. Khanani conspired to harbor one hundred or more aliens, USSG § 2L1.1(b)(2)(C); an adjustment for role in the offense of four (4) on the basis that Mr. Khanani "was an organizer or leader of criminal activity that involved five or more participants," USSG § 3B1.1(a); and an adjustment of two (2) on the basis that Mr. Khanani obstructed or attempted to obstruct justice, § 3C1.1.  Mr. Khanani objects to all of the enhancements of the offense level for his immigration offenses.

---

[22]  Under the fraud loss table, a loss of more than $800,000 but less than or equal to $1.5 million yields an offense level of eleven (11).  USSG § 2F1.1(b)(1)(L)-(M).

**1.  Specific Offense Characteristic: Number of Aliens Smuggled, Harbored, or Transported (§ 2L1.1(b)(2)(C))**

The immigration guideline provides for enhancements based on the "number of unlawful aliens" that the defendant "smuggled, transported, or harbored."  USSG § 2L1.1(b)(2).  Mr. Khanani objects to this enhancement on the basis that his immigration offenses fall outside the categories of smuggling, harboring, or transporting.  The Government raises two arguments in response.  First, the Government contends that § 2L1.1 contemplates offenses other than "smuggling, transporting, [and] harboring," including the offense of encouraging aliens to reside in the United States, 18 U.S.C. § 1324(a)(1)(A)(iv).  Second, the Government contends that the definition of harboring is broad enough to cover Mr. Khanani's offenses.[23]  Although neither of these arguments proves persuasive, the Probation Office's application of § 2L1.1(b)(2)(C) is nonetheless saved by a catch-all provision in the Guidelines which instructs that "the most analogous offense guideline" should be applied to offenses "for which no guideline expressly has been promulgated."  USSG § 2X5.1.

**a.  Scope of § 2L1.1**

The Government submits that a construction limiting § 2L1.1(b)(2)(C) to its plain terms would constitute an "unduly restrictive" interpretation.  AUSA Letter, at 4.  It is not clear what principle, if any, the Government's argument rests upon, but whatever it may be, it is clearly outweighed by the command of strict construction.

_____

[23]  The Government does not contend nor is there otherwise any evidence that Mr. Khanani smuggled or transported any aliens.

The sentencing guidelines are criminal laws and thus are subject to the rule that penal laws must be construed strictly.  United States v. Dipina, 178 F.3d 68, 72 (1st Cir. 1999) (citing United States v. Khang, 904 F.2d 1219, 1222 (8th Cir. 1990) ("[T]he sentencing guidelines must be strictly construed.").[24]  The rule of strict construction simply requires "that words [be] given their ordinary meaning and that any reasonable doubt about the meaning [be] decided in favor of anyone subjected to a criminal statute."  3 Norman J. Singer, Sutherland Statutes and Statutory Construction § 59:3 (6th ed. 2005).  Under this rule, there is no legitimate place for reading offenses into § 2L1.1.

### b.  The Meaning of Harboring Under § 1324(a)

The determination that § 2L1.1(b)(2)(C) applies only to "smuggling, transporting, or harboring" does not, however, resolve the issue of whether harboring is a broad enough term to encompass offenses such as the encouraging or inducing of aliens to reside in the United States or the concealment or shielding of aliens from detection.  See 8 U.S.C. § 1324(a)(1)(A)(iii).  Although this is not the first time that the meaning of harboring has emerged as an issue in this case, it is the first time that the term must be defined

---

[24] Few rules enjoy greater status in the system of American jurisprudence.  As Chief Justice Marshall famously observed:

> The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the Court, which is to define a crime, and ordain its punishment."

United States v. Wiltberger, 5 Wheat. 76, 95 (1820), *quoted in* Dowling v. United States, 473 U.S. 207, 213-14  (8th Cir. 1985).

independently of other terms contained in 8 U.S.C. § 1324(a).[25]  The parties' dispute over the meaning of "harboring" focuses mainly on the breadth of the term.  While the Government argues that "harboring" includes any action taken to encourage aliens to reside in the United States, Mr. Khanani maintains that harboring merely means to house or shelter aliens.  See Tr. of Sentencing Oral Arg., at 30-31.

The uncertainty surrounding the meaning of harboring initially arises from the fact that neither the Immigration and Nationality Act, 8 U.S.C. § 1101 et seq., nor the Immigration Sentencing Guideline, Chapter 2, Part L, defines the term.  Where lawmakers fail to define a term, the first resort of the courts should be to the term's "common usage."  Consol. Bank, N.A. v. United States Dep't of the Treasury, 118 F.3d 1461, 1464 (11th Cir. 1997); see also Shotz v. City of Plantation, 344 F.3d 1161, 1167 (11th Cir. 2003) ("The first rule in statutory construction is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute.") (internal quotations and citations omitted).

In determining "the common usage or ordinary meaning of a term, courts often turn to dictionary definitions for guidance."  CBS Inc. v. PrimeTime 24 Joint Venture, 245 F.3d 1217, 1223 (11th Cir. 2001).  In this instance, however, dictionary definitions serve only to highlight the parties' dispute over the definition of harboring.  For example, definitions of "harbor" in Webster's Third New International Dictionary ("Webster's") include both "to give shelter or

---

[25]  The Court instructed the jury that "[t]o conceal, harbor or shield from detection includes any knowing conduct by the Defendant tending to substantially facilitate an alien's escaping detection as an illegal alien, thereby remaining in the United States illegally."  Doc. 780, at 19.

refuge to"[26] as well as "to receive clandestinely and conceal." *Webster's* 1031 (1981). While

the first of the two definitions plainly supports the narrow construction urged by Mr. Khanani,

the latter definition lends itself to the Government's position that "harboring" may mean more

than just the provision of housing or shelter.[27]

   In light of the lack of clarity surrounding the definition of "harboring," analysis must now

give way to "traditional tools of statutory construction." Shotz, 344 F.3d at 1167 ("If the

statutory [term] is not entirely transparent, [courts] employ traditional canons of construction

before 'reverting to legislative history . . . .") (internal quotations and bracketing omitted).

Although the ultimate task here is to interpret "harboring" for the purpose of applying § 2L1.1,

the use of the term as an immigration violation originally derives from 8 U.S.C. § 1324(a).

Thus, it is there that the task of construction must begin.

   Section 1324(a) provides as follows:

   **Bringing in and harboring certain aliens**
   * * *
   (A) Any person who–
   (i) knowing that a person is an alien, brings to or attempts to bring to the United

---

   [26] See also American Heritage Dictionary (4th ed. 2000) (online version) (defining "harbor" as "to give shelter to"); Merriam-Webster's Collegiate Dictionary 529 (10th ed. 1999) (defining "harbor" as "to give shelter or refuge to").

   [27] Other dictionaries demonstrate an ambivalence similar to that of *Webster's*. See, e.g., Black's Law Dictionary 847 (4th ed. 1951) (defining "harbor" as "[t]o afford lodging to, to shelter, or to give a refuge to" as well as "[t]o receive clandestinely and without lawful authority a person for the purpose of so concealing him that another having a right to the lawful custody of such person shall be deprived of the same" and explaining that the term "may be aptly used to describe the furnishing of shelter, lodging, or food clandestinely or with concealment, and under certain circumstances may be equally applicable to those acts divested of any accompanying secrecy"); Black's Law Dictionary 733 (8th ed. 2004) (providing different definitions for "harboring" and "harboring an illegal alien").

-30-

States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien;

(ii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law;

(iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation;

(iv) encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law; or

(v) (I) engages in any conspiracy to commit any of the preceding acts, or

(II) aids or abets the commission of any of the preceding acts,

shall be punished as provided in subparagraph (B).

The principal difficulty in construing "harboring" under § 1324(a) arises from the provision's two distinct uses of the term.  Much like the dictionary definitions of "harbor" or "harboring," the multiple uses of the term in § 1324(a) provide fodder for both the Government and Mr. Khanani.

On the one hand, the title of the section, *Bringing in and harboring certain aliens*, suggests that all of the conduct proscribed under § 1324(a) falls into either one of two categories: (1) the bringing of aliens into the United States; or (2) the harboring of aliens once they are already in the United States.  Under this theory, the "bringing in" of aliens would primarily include smuggling, whereas harboring would "encompass[] [all] conduct tending substantially to facilitate an alien's remaining in the United States illegally and to prevent government authorities from detecting his unlawful presence." United States v. Kim, 193 F.3d 567,  574 (2d Cir. 1999).  At a minimum, such conduct would include all of the offenses

-31-

delineated in § 1324(a)(1)(A)(iii), since those offenses involve actions taken toward aliens once they are already present in the United States.[28]

This construction of "harboring" fails, however, to accord any meaning to "harbor" as it used in § 1324(a)(1)(A)(iii), and, thus, violates the basic principle of construing a "statute so that [none of its] words shall be discarded as meaningless, redundant, or mere surplusage." Shotz v. City of Plantation, 344 F.3d 1161, 1173 (11th Cir. 2003); see also Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used.") (quoting United States v. DBB, Inc., 180 F.3d 1277, 1285 (11th Cir. 1999)).  Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings . . . .") (citation omitted).  If "harboring" is defined to encompass the acts of "concealing" and "shielding [aliens] from detection," § 1324(a) would be left to read that it is criminal for "any person who . . . knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States . . . **conceals, [conceals or shields from detection], or shields from detection**, such alien in any place, including any building or any means of transportation."[29] Cf. United States v. Cantu, 557 F.2d 1173, 1180 (5th Cir. 1977) (determining that the synonymous construction of "shield from detection" and "conceal" under § 1324(a) would be redundant).  To avoid the redundancy of

_____

[28] The case could be made that encouraging or inducing aliens to "come to, enter, or reside in the United States," 8 U.S.C. § 1324(a)(1)(A)(iii), is more akin to the "bringing in" of aliens than the "harboring" of them.

[29] Reversing the choice of substitution, the statute would make it criminal for "any person who . . . knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States . . . **[harbors], harbors, or [harbors]**, such alien in any place, including any building or any means of transportation."

this construction, "harbor" must be interpreted as having a meaning distinct from "conceal" and "shield from detection"–an objective that can only be accomplished by defining "harbor" narrowly as "to afford[] lodging [or] shelter to."[30]  Black's Law Dictionary 733 (8th ed. 2004).

This is not to say, however, that "harboring" must mean "to give shelter to" for all purposes related to § 1324(a).  The flip side of the analysis just set forth is that, if "harboring" is defined only as giving shelter to, the title to § 1324(a) would cease to cover the scope of the conduct proscribed by § 1324(a).[31]

The only solution to this interpretive predicament is to take a contextual approach to the meaning of "harboring."  If "harboring" is used generally to refer to multiple § 1324(a) offenses, then the term should be interpreted to mean, at a minimum, all of the conduct

---

[30]  Under this construction, there would be potential overlap between the three types of conduct proscribed under § 1324(a)(1)(A)(iii).  This, however, poses no problem so long as each term is accorded a distinct meaning.  The act of providing shelter, even to a person known to be an illegal alien, does not necessarily entail concealing or sheltering that alien from detection.  Likewise, as the convictions in this case make clear, it is possible to conceal or shield aliens from detection without sheltering them.  The distinction between concealing and shielding poses a more difficult problem.  However, in this circuit, there is no question that the terms have different meanings under § 1324. As the former Fifth Circuit explained:

> Although "shield" and "hide" may in some contexts be synonymous, in the context of section 1324 they are not. Section 1324 forbids attempts "to conceal, harbor, or shield from detection." Were "shield from detection" used synonymously with "hide" then "conceal" would be redundant.

United States v. Cantu, 557 F.2d 1173, 1180 (5th Cir. 1977); see also Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting all Fifth Circuit holdings prior to September 30, 1981 as binding precedent).

[31]  For example, if harboring were defined as only the provision of shelter or housing, neither the "bringing" of aliens into the United States nor the harboring of them would include shielding aliens from detection.  The whole point of shielding aliens from detection is to prevent their detection once they are in the United States.

contained under § 1324(a)(1)(A)(iii).  See United States v. Zheng, 306 F.3d 1080, 1086 (11th

Cir. 2002) (referring to harboring in the general sense of facilitating an alien's presence in the

United States).  On the other hand, if "harboring" is used to refer to a particular offense, then

the term should be interpreted to mean sheltering and nothing more.  See United States v. De

Evans, 531 F.2d 428, 430 (9th Cir. 1976) (finding that the purpose of § 1324(a) "is best

effectuated by construing 'harbor' to mean 'afford shelter to'"); Cantu, 557 F.2d at 1180.  By

drawing on both definitions of "harboring," this flexible construction avoids the difficulties that

arise if only one of the definitions of "harboring" obtains.

### c.  The Meaning of Harboring Under § 2L1.1

Significantly, the question of what "harboring" means arises not just in relation to the

enhancement of § 2L1.1(b)(2), as Mr. Khanani contends, but to § 2L1.1 as a whole.[32]  Just

as § 2L1.1(b)(2) refers to only the offenses of "smuggling, transporting, [and] harboring," so,

too, does the title of § 2L1.1 and all of its various other provisions.  USSG § 2L1.1 (entitled

"Smuggling, Transporting, or Harboring an Unlawful Alien.")

While neither § 2L1.1 nor its commentary provides any direct clues to the meaning of

"harboring," the anti-redundancy canon militates, once more, against the Government's

position.  To avoid the problem of redundancy under § 2L1.1, "smuggl[ing], transport[ing],

[and] harbor[ing]" should each be defined to have distinct meanings, something which cannot

be accomplished by employing the broad definition of "harboring."  Although "smuggling"

---

[32]  At oral argument, counsel for Mr. Khanani stated that his argument as to the
applicability of § 2L1.1(b)(2) did not otherwise implicate § 2L1.1.  Tr. of Sentencing Oral Arg.,
at 36-37.

clearly does not fall under "conduct tending substantially to facilitate an alien's *remaining* in the United States," <u>Kim</u>, 193 F.3d at 574 (emphasis added), "transporting" aliens once they are already in the United States does.  <u>See</u> <u>Zheng</u>, 306 F.3d at 1087 ("Congress . . . chose to penalize employers for hiring illegal aliens and harboring them from detection by providing transportation and housing for them.").   Thus, were the broad definition of "harboring" employed in § 2L1.1, all references to "transporting" in the guideline would be rendered meaningless.[33]  Although this fact does not alone establish that Mr. Khanani's definition of "harboring" should obtain under § 2L1.1, it at least establishes the unworkability of the definition urged by the Government.

### d.  Application of the Most Analogous Offense Guideline (§ 2X5.1)

Notwithstanding my rejection of the Government's proffered definition of "harboring," § 2X5.1 obviates the need to evaluate the merits of the narrower definition urged by Mr. Khanani.[34]  If, in the context of § 2L1.1, "harboring" were interpreted to mean only the provision of housing or shelter, this would mean that Mr. Khanani's immigration offenses– none of which involved providing aliens with housing or shelter–would be left without a guideline.  However, under § 2X5.1's instruction to apply the "most analogous" guideline to

---

[33]   The problem is not solved by interpreting "transporting" to mean only the "transporting" of aliens into the United States; this would serve only to exchange one redundancy for another by making transporting redundant of smuggling.

[34]   Were it not for § 2X5.1, the rule of lenity likely would have counseled in favor of adopting the narrow definition urged by Mr. Khanani even if that definition could not have been established by applying tools of statutory construction.  <u>See</u> <u>Holloway v. United States</u>, 526 U.S. 1, 12 n.14 (1999) (instructing that the rule of lenity should be applied when courts can only "guess" as to what the legislature intended).

offenses "for which no guideline expressly has been promulgated," Mr. Khanani's immigration offenses would have to be scored under § 2L1.1 anyway.  Not only is § 2L1.1 the only guideline that addresses offenses proscribed under § 1324(a), but the acts of smuggling, harboring, and transporting are also highly analogous to the offenses of concealing and shielding aliens from detection.   As far as the more specific question of applying the enhancement under § 2L1.1(b)(2)(C) is concerned, the Guidelines are clear: the "incorporation of a guideline by cross-reference requires incorporation of the '*entire*' cross-referenced guideline, including 'the base offense level, *specific offense characteristics*, cross references, and special instructions.'"   United States v. Maloney, 406 F.3d 149, 152 (2d Cir. 2005) (quoting USSG § 1B1.5(b)(1)) (emphasis added).

The only remaining question is whether Mr. Khanani's immigration offenses involved one hundred or more aliens.  There can be no serious so serious dispute on this point.  The record plainly shows that Mr. Khanani conspired to conceal and shield at least one hundred aliens from detection by, among other things, paying the aliens off the books and setting up an alarm system to warn the aliens in the event of an immigration raid.  See PSR ¶ 28; see also Zheng, 306 F.3d at 1087 (noting the "overlap" between the misdemeanor offense of hiring and employing unauthorized aliens and § 1324(a)).

### 2.  Role in the Offense: Organizer or Leader of Extensive Criminal Activity (§ 3B1.1(a))

Mr. Khanani objects to an enhancement on this ground on the theory that the scheme to conceal and shield illegal aliens was not organized and that, even if it was, he was not an organizer or leader of it.  The record indicates otherwise.  At trial, the Government showed

that Mr. Khanani helped to organize and lead an elaborate scheme involving the use of shell companies to pay illegal aliens "off the books" in order to conceal their identity from federal immigration authorities.  Mr. Khanani's objection is, therefore, overruled.

### 3.  Adjustment for Obstruction of Justice (§ 3C1.1)

The Government submitted evidence at trial that Mr. Khanani told two of his workers to inform the authorities that he was "unaware of the hiring of illegal aliens."  Mr. Khanani made no attempt to rebut this evidence.  As such, the evidence of obstruction is slim but sufficient.

### 4.  Conclusion: Total Offense Level for Immigration Offenses

All of Mr. Khanani's objections to the Probation Office's calculation of the offense level for his immigration offenses having been overruled, the applicable offense level for those offenses is twenty-seven (27).

### C.  MULTIPLE GROUP ADJUSTMENT

Under the formula for multiple group adjustment set forth in § 3D1.4, the Probation Office added three levels to Mr. Khanani's combined offense level.  However, following the grouping of Mr. Khanani's tax and fraud offenses, § 3D1.4 now prescribes one unit to the tax and fraud offenses for having the highest offense level of any of the groups of offenses, § 3D1.4(b), and one unit to the immigration offenses for having an offense level within one to four levels less than the offense level for the tax and fraud offenses.  Under the unit-to-level conversion table in § 3D1.4, two units equate to two additional levels.

### D.  COMBINED OFFENSE LEVEL

Based on the analysis set forth above, the combined offense level for Mr. Khanani's offenses equals twenty-nine (29).

### E.  CRIMINAL HISTORY SCORE

As reflected in the PSR, Mr. Khanani has no criminal history and must, therefore, be assigned a criminal history score of zero.

### F.  ADVISORY SENTENCING RANGE

Based on the cross-referencing of Mr. Khanani's combined offense level and criminal history category on the Guidelines sentencing grid, the advisory sentencing range for Mr. Khanani is 87 to 108 months.

### V.  IMPOSITION OF A REASONABLE SENTENCE

My concluding obligation in this case is to impose a sentence  that is "sufficient but not greater than necessary" to "reflect the seriousness of [Mr. Khanani's offenses], promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and effectively provide [Mr. Khanani] with needed educational or vocational training and medical care." Booker, 125 S. Ct. at 765 (citing § 3553(a)(2)).  "Factors to be considered in imposing [such] a sentence" include:

> (1) the nature and circumstances of [Mr. Khanani's offenses] and the history and characteristics of [Mr. Khanani];
> * * *
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the [advisory] sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;
> (5) any pertinent policy statement . . . [issued by the Sentencing Commission];
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).  It is also permissible to consider any "information concerning the background, character, and conduct" of Mr. Khanani in "imposing an appropriate sentence." 18 U.S.C. § 3661.

As reflected in the analysis set forth below, I have considered all of the above factors, and based on those factors, determine that the purposes of sentencing will be sufficiently satisfied by sentencing Mr. Khanani to seventy (70) months in prison, to be followed by two years of supervised release, and by ordering him to pay a fine in the amount of $15,000 and restitution to the State of Florida in the amount of $259,978.[35]

### A.  THE SERIOUSNESS OF MR. KHANANI'S OFFENSES

In arguing for a "minimal" sentence, Mr. Khanani primarily contends that his immigration offenses are not that severe in relation to other types of immigration offenses.  Additionally, he seeks to minimize the importance of his tax and fraud offenses mainly by emphasizing that his tax offenses were "intertwined" with his immigration offenses.

There is merit to Mr. Khanani's contention that his immigration violations are not particularly severe relative to other types of immigration offenses.  First, there is no evidence in the record that Mr. Khanani engaged in gross exploitation of any illegal aliens or that he otherwise did anything to place the aliens in physical danger.  The worst that can be said of Mr. Khanani's treatment of his undocumented employees is that he and his coconspirators

---

[35] The Probation Office correctly determined that Mr. Khanani and his coconspirators evaded $259,978 of sales tax owed to the State of Florida.  Based upon consideration of "the need to provide restitution to any victims of [Mr. Khanani's offenses]," he shall be required to repay this amount.  18 U.S.C. § 3553(a)(7).  Mr. Khanani shall be liable for this full amount because, in contrast to his co-defendant David Portlock ("Mr. Portlock"), Mr. Khanani owned the businesses that failed to pay the sales tax and, therefore, stood to gain much more by the evasion.

failed to pay them the legally required rate for overtime.[36]   Even this fact, however, is

substantially ameliorated by evidence that the workers were paid at a rate equal to or greater

than the federal minimum wage.   Second, the evidence presented in this case, through the

testimony of Mr. Roger Bernstein, a former assistant counsel for the Immigration and

Naturalization Service in Miami, Florida, is that cases involving conduct of the manner and

scope committed by Mr. Khanani are ordinarily resolved through civil settlement proceedings.

Examination of case law, at least in this circuit, indicates, moreover, that when conduct like

Mr. Khanani's is criminally prosecuted, it tends to be charged under the misdemeanor section

of the immigration statute, 8 U.S.C. § 1324a ("Unlawful employment of aliens"), rather than

the felony provision under which Mr. Khanani was charged, 8 U.S.C. § 1324(a)(1)(A)(iii)-(iv).

In view of all of these facts, I do not believe that Mr. Khanani's immigration offenses, taken

alone, merit a lengthy prison sentence.[37]

---

[36]   Contrary to the Government oft-repeated contention that Mr. Khanani forced undocumented employees to work overtime, there is no evidence of that fact in the record. Nor, for that matter, did the Government succeed in showing that Mr. Khanani's employment of alien workers resulted in a competitive advantage for his businesses.

[37]   Mr. Khanani has also moved for a downward departure from the advisory guideline range on the basis that the aspects of his case are "unusual enough for it to fall outside the heartland of cases in the Guidelines." Doc. 1013-1, at 15 (quoting Koon v. United States, 518 U.S. 81, 98 (1996). Although the facts of Mr. Khanani's case are somewhat unusual, to the extent that departures of any sort remain relevant in an advisory sentencing regime, a heartland departure in Mr. Khanani's case is not warranted.

After Booker and the Eleventh Circuit's opinion in United States v. Crawford, 407 F.3d 1174, 1182-83 (11th Cir. 2005), it appears possible to reach two very different conclusions regarding the present status of downward departures: (1) that departures are part of "calculating an advisory guideline range," see id. at 1182 ("Lack of criminal sophistication is not a permissible ground for a downward departure in calculating an advisory guideline range.") (emphasis added); or (2) downward departures of the same variety that existed pre-Booker may be made from the advisory guidelines range and will be subjected to the same

Mr. Khanani's tax and fraud offenses are, however, another matter.   Despite his considerable wealth, Mr. Khanani consciously entered into a scheme to evade taxes in which he and others deprived the State of Florida and the federal government of hundreds of thousands of dollars.   No society that depends on its citizens to meet their tax obligations can tolerate such blatant disregard for its tax laws.

Thus, to account for the seriousness of Mr. Khanani's tax and fraud offenses and to promote respect for the nation's tax laws, a prison term of substantial length is necessary. Such term, however, need not fall within the length recommended by the Guidelines.[38] Rather, upon careful consideration of the advisory Guidelines sentencing range and "other

------

standard of review that prevailed pre-<u>Booker</u>, <u>see id.</u> at 1183 ("On remand, the district court must calculate an advisory guideline range that includes the more than minimal planning enhancement and considers whether to grant a downward departure *from that advisory guideline range* consistent with this opinion.") (emphasis added); <u>But see id.</u> at 1179 ("After it has made [the advisory Guidelines] calculation, the district court *may impose a more severe or more lenient sentence as long as the sentence is reasonable*") (emphasis added).

[38] The Government's argument that the evidence of Mr. Khanani's "greed" in this case counsels in favor of a harsher sentence is not convincing.   The facts of this case, while perhaps demonstrating some greed on Mr. Khanani's part, do not show, as the Government seems to suggest, that such greed was extraordinary.   First, although Mr. Khanani's businesses did not pay undocumented employees overtime wages, they did pay the workers minimum wage or better for all of the hours they worked.   Second, there is evidence in the record that Mr. Khanani's conduct was sometimes driven by motives other than monetary gain.   At trial, the Government provided a firsthand account of an undocumented worker through the testimony Ms. Hahid Kadri.   While wired by government agents, Ms. Kadri met with Mr. Khanani and asked him for a job.   Mr. Khanani initially refused Ms. Kadri's request and only acquiesced after Ms. Kadri resorted to begging.   In the final analysis, although the record evidence clearly establishes that Mr. Khanani illegally employed undocumented workers for a long time and profited as a result, it is not clear that greed was his sole, or even overriding, objective.

kinds of sentences available," I find that a sentence of seventy (70) months is sufficient but

not greater than necessary to reflect the seriousness of Mr. Khanani's offenses.[39]

---

[39] This conclusion squares with my belief that it is necessary to consider the extent to which the standard of proof for sentencing-enhancing facts varies from the standard of proof required for jury convictions.  Pursuant to the tax guideline, the tax loss resulting from Mr. Khanani's tax offenses was calculated to be $1.2 million; this tax loss, in turn, formed the sole basis for the determination that the base offense level for Mr. Khanani's tax offenses was nineteen (19).  The only part of this amount, however, that the Government convincingly proved was $473,677.  The remaining amount is made up of taxes that should have been withheld from the paychecks of the undocumented employees, a substantial portion of which could have been returned to the employees in the form of tax refunds.  Thus, by imposing a sentence lower than the range recommended by the Guidelines, I avoid punishing Mr. Khanani on the basis of an amount that was not only not proven to a jury beyond a reasonable doubt, but was not established with any degree of certainty.

A sentence of seventy (70) months also sufficiently accounts for "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(7).  Initially, there were six individual defendants charged in this case.  Jesse Maali died before the case proceeded to trial.  Khan Aslam ("Mr. Aslam") and Saeedullah Awan ("Mr. Awan") pled guilty to the charge of conspiracy to conceal, harbor, and shield illegal aliens from detection and to encourage and induce illegal aliens to reside in the United States.  The Government filed motions pursuant to USSG § 5K1.1 asking me to recognize substantial assistance that Mr. Aslam and Mr. Awan gave the Government in this case.  The Government's motions were granted and both defendants were sentenced to terms of probation.  Mahmood Jamal was charged with misprision of a felony.  The Government also filed a § 5K1.1 motion on behalf of Mr. Jamal.  The Government's motion was also granted in Mr. Jamal's case and he, too, was sentenced to a term of probation.

The only other co-defendant is Mr. Portlock whose case proceeded to trial along with Mr. Khanani's.  Mr. Portlock was convicted of one count of conspiring to conceal, harbor, or shield from detection, or to encourage or induce aliens to illegally come to, enter, or reside in the United States (Count 54), one count each of wire and mail fraud (Counts 56-57), one count of conspiring to attempt to evade federal taxes (Count 58), and thirteen counts of attempting to evade federal employment or federal income taxes (Counts 59-71).  Mr. Portlock has not yet been sentenced on these counts but shall receive a sentence less than that now being imposed on Mr. Khanani.

In determining a reasonable sentence for Mr. Khanani, I have considered the sentences received by Mr. Aslam, Mr. Awan, and Mr. Jamal as well as the sentence that shall be imposed on Mr. Portlock.  The fact that these sentences are or shall be less severe

## B.  ADEQUATE DETERRENCE

Mr. Khanani argues that "[a] minimal sentence," or simply "the suffering [he] has endured over the past three years," "would adequately deter others from . . . conduct [like that which he has committed]."  Doc. 1014-1, at 18-19.  I disagree.  Although Mr. Khanani and his family have, no doubt, suffered considerably through the course of these proceedings, to limit his punishment to the rigors of a trial that he brought upon himself, or even to impose a "minimal sentence," would not result in an adequate level of deterrence.  Rather, a harsher sentence must be imposed in order to counterbalance the potential profits that come from flouting the immigration and tax laws.  After carefully considering the advisory Guidelines sentencing range and "other kinds of sentences available," I have determined that a sentence that of seventy (70) months is sufficient but not greater than necessary to adequately deter violation of the immigration, fraud, and tax laws.

## C.  PROTECT THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT

---

than the sentence now imposed on Mr. Khanani reflects not only that the conduct of the co-defendants was less serious, but additionally the fact that the co-defendants, unlike Mr. Khanani, were not owners of the businesses that benefitted from the criminal scheme in which they and Mr. Khanani engaged.  Mr. Awan and Mr. Aslam, in fact, were lower-level employees who participated in the criminal scheme only after they were instructed to do so. Although Mr. Jamal was directly involved with the management of the businesses, he distanced himself from that role after becoming aware of how many undocumented workers the businesses were employing.  Mr. Portlock, though significantly more culpable than Mr. Awan, Mr. Aslam, or Mr. Jamal, was convicted of fewer counts than Mr. Khanani, made no efforts to impede the federal authorities in investigation of his and the other defendants' criminal conduct, and stood to gain significantly less than Mr. Khanani as a result of the criminal scheme.

Mr. Khanani has no criminal past other than the convictions in this case.  In addition, evidence of Mr. Khanani's character presented in the post-trial sentencing phase of these proceedings indicates that, apart from the offenses giving rise to this case, Mr. Khanani possesses a sound character.  Those who testified at Mr. Khanani's sentencing hearing or submitted letters on his behalf describe him as a generous, hard-working community leader and gentle and loving patriarch of his family.[40]  Based on Mr. Khanani's lack of criminal history and the evidence of his good character, it is evident that  Mr. Khanani poses no threat to the public.  This fact reinforces my determination that a sentence within the advisory Guidelines range need not be imposed and that a sentence of seventy (70) months is sufficient.[41]

---

[40]  Among other things, the witnesses testified to the considerable time and money that Mr. Khanani has expended in an effort to assist women and children living in impoverished regions of Pakistan and Africa.

[41]  The Government has pointed to certain policy statements contained in USSG §§ 5K2.0 (Other Grounds for Departure), 5H1.6 (Family Ties and Responsibilities and Community Ties), and 5H1.11 (Military, Civic, Charitable, or Public Service; Employment-Related Contributions; Record of Prior Good Works), to dissuade me from "departing" from the advisory sentencing range on the basis of Mr. Khanani's family circumstances, charitable works, or any other offender characteristics.  Having considered these policy statements in accordance with 18 U.S.C. § 3553(a)(7), I agree with the Government that the statements counsel against granting any departures on the basis of Mr. Khanani's characteristics or family circumstances.  The policies cited by the Government do not, however, advise against the weighing of offender characteristics and family circumstances in evaluating the purposes of sentencing under § 3553(a)(2).  Indeed, in determining what constitutes a reasonable sentence pursuant to these purposes, § 3553(a)(1) not only allows but requires consideration of "the history and characteristics of the defendant."  See also 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").  In my discretion, I have determined that Mr. Khanani's character is most relevant to evaluating whether, and to what extent, a prison sentence is necessary to protect the public from further crimes of Mr. Khanani.

### D.  EDUCATIONAL OR VOCATIONAL TRAINING, MEDICAL CARE, OR OTHER CORRECTIONAL TREATMENT

Mr. Khanani has demonstrated no need for educational or vocational training, medical care, or other correctional treatment.  Thus, were this the only sentencing purpose that I had to consider, an alternative sentence, such as the imposition of fine, might suffice.  However, as has already been explained, the need to promote respect for the law and to provide adequate deterrence to serious criminal conduct requires that I impose a prison sentence of seventy (70) months.

### E.  OTHER CONSIDERATIONS

Relying on 18 U.S.C. § 3661, Mr. Khanani has asked me to consider factors not covered in §3553(a).  Mr. Khanani requests, first, that his voluntary agreement to forfeit $1.5 million to the Government and his subsequent fulfillment of that agreement be considered. Mr. Khanani's cooperation with the Government has been considered but has been deemed to have no weight.  Mr. Khanani's cooperation came only after he was convicted and thus, in all probability, merely demonstrates his natural desire to receive a lenient sentence.  Mr. Khanani also asks that any misconduct that the Government committed during and in the time leading up to these proceedings be considered.  There is, however, no basis in existing law to take this fact into consideration in sentencing.  Cf. 18 U.S.C. § 3661 (noting that courts may consider any "information concerning the background, character, and conduct"  of the defendant).

## VI.  CONCLUSION

Having considered the factors set forth in 18 U.S.C. § 3553(a), I order that Mr. Khanani shall be confined to the custody of the Federal Bureau of Prisons for a period of seventy (70) months and shall pay a fine of $15,000 and restitution to the State of Florida in the amount of $259,978.  I further order that, upon Mr. Khanani's release from prison, he shall be committed to supervised release for a period of two (2) years.

**DONE and ORDERED** in Orlando, Florida on this 7th day of September, 2005.

JOHN ANTOON II
United States District Judge

Copies furnished to:

United States Marshal

United States Attorney

United States Probation Office

United States Pretrial Services Office

Counsel for Defendant

JESSE ISSA MAALI

M. SALEEM KHANANI

KHAN ASLAM

SAEEDULLAH AWAN

MAHMOOD JAMAL

BIG BARGAIN WORLD, INC.

SS MART, INC.

JEANS UNLIMITED, INC.

DENIM UNLIMITED, INC.

BARAKAT CORPORATION

BARAKAT INTERNATIONAL, INC.

DAVID PORTLOCK